25 CV 04924

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

EDWARD B. HUBBUCH,

      Plaintiff,

*v.*

YOEL KOHN a/k/a JOEL KOHN,
788 FRANKLIN REALTY LLC, and
WATERMARK CAPITAL GROUP LLC,
individually and doing business as
SDA/WATERMARK CAPITAL MANAGEMENT,

      Defendants.

Case No.: _____

**COMPLAINT FOR VIOLATIONS OF
THE FAIR CREDIT REPORTING ACT,
CREDIT DEFAMATION,
FRAUDULENT MISREPRESENTATION,
AND TORTIOUS INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE**

**[TRIAL BY JURY DEMANDED]**

## COMPLAINT FOR VIOLATIONS OF THE FAIR CREDIT REPORTING ACT, CREDIT DEFAMATION, FRAUDULENT MISREPRESENTATION, AND TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

## I. INTRODUCTION

1. Plaintiff Edward B. Hubbuch brings this civil action under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, and New York common law, asserting claims for credit defamation, fraudulent misrepresentation, and tortious interference with prospective economic advantage. This action seeks redress for Defendants' deliberate and deceptive reporting of Plaintiff's commercial lease obligations as a personal loan tradeline on Plaintiff's consumer credit file—an act that has caused severe and ongoing financial harm.

2. In June 2020, Defendant YOEL KOHN a/k/a JOEL KOHN, acting individually and through 788 FRANKLIN REALTY LLC and WATERMARK CAPITAL GROUP LLC, induced Plaintiff to provide his personal Social Security Number ("SSN"), date of birth, and a copy of his New York State driver's license on a document falsely described as a routine Guaranty agreement. Relying on Defendants' representations, Plaintiff signed in good faith, unaware that his personal identifiers would be misused. Days later, Defendants fraudulently leveraged Plaintiff's SSN, date of birth , and New York State driver's license information to fabricate a false tradeline, furnishing it to credit reporting agencies and falsely listing Plaintiff as the borrower on a nonexistent personal loan.

3. The entity reported to the credit reporting agencies as "SDA/WATERMARK CAPITAL MANAGEMENT" is, upon information and belief, a fictitious business name controlled by Defendant YOEL KOHN a/k/a JOEL KOHN deliberately used this alias to conceal KOHN's personal involvement while misrepresenting commercial rent obligations as consumer credit activity. Further, upon information and belief, "SDA/WATERMARK CAPITAL

MANAGEMENT" is not a registered business entity in any jurisdiction, making its use in credit reporting intentionally deceptive and unlawful.

4. Defendants further obscured their identity by deliberately listing the official business address of "SDA/WATERMARK CAPITAL MANAGEMENT" as 30 North Gould Street, Suite 22928, in Sheridan, Wyoming—a commercial dropbox widely recognized as a hub for fraudulent shell companies and corporate anonymity. Investigations by consumer protection authorities, investigative journalists, and regulatory agencies—including the Better Business Bureau, the Wyoming Attorney General's Office, and *The Sheridan (Wyoming) Press*—have documented this address as a long-standing tool for fraudulent corporate operations designed to evade regulatory oversight.

5. Defendants' actions were not merely negligent but deliberate and calculated, designed to fabricate consumer debt, damage Plaintiff's credit profile, and obscure the true origin of the reporting.

6. As a direct consequence of Defendants' unlawful actions, Plaintiff has suffered significant financial harm, reputational injury, and emotional distress, including the closure of a second restaurant location in Manhattan

and the abandonment of a critical catering kitchen due to financing denials directly caused by Defendants' fraudulent reporting.

7. Given the severity of these actions—including the fraudulent misuse of Plaintiff's SSN, date of birth, and New York State driver's license information in execution of identity theft, deceptive credit reporting, and improper tradeline furnishing—Plaintiff reserves the right to refer this matter to federal and state regulatory agencies, including the U.S. Consumer Financial Protection Bureau (CFPB), the Federal Trade Commission (FTC), the New York Attorney General's Office, as well as to criminal authorities for further investigation into potential violations of federal fraud statutes.

## II.  JURISDICTION AND VENUE

8. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, as Plaintiff's claims arise under the Fair Credit Reporting Act (FCRA). The Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial portion of the wrongful conduct and resulting harm occurred within the Southern District of New York. Specifically:

- **Defendants' fraudulent credit reporting targeted financial institutions headquartered in Manhattan, including banks and credit bureaus that relied on the false tradeline data;**

- **Plaintiff suffered material financial harm within this District, as the inability to obtain loans and financing—caused by Defendants' wrongful reporting—forced Plaintiff to close a second restaurant location in Manhattan and abandon a catering kitchen vital to his business operations;** and

- **The direct impact of Defendants' fraudulent tradeline affected Plaintiff's financial standing in SDNY, where credit markets and commercial leasing decisions crucial to his business were centered.**

10. Although Plaintiff resides in Kings County, his financial losses, business closures, and reputational damage occurred in the Southern District, making it the proper venue for adjudicating these claims.

## III. PARTIES

11. Plaintiff Edward B. Hubbuch ("Plaintiff") is a natural person residing in Kings County, New York, and the sole owner and operator of Memphis Seoul, a restaurant located at 569 Lincoln Place, Store #3, in Brooklyn, New York.

12. Defendant YOEL KOHN a/k/a JOEL KOHN is an individual residing in the State of New York. Upon information and belief, KOHN is a founding partner of WATERMARK CAPITAL GROUP LLC along with fellow founding partners Wolfe Landau and David Tabak. Upon information and belief, YOEL KOHN a/k/a JOEL KOHN also is the principal owner and controlling member of 788 FRANKLIN REALTY LLC.

13. Defendant 788 FRANKLIN REALTY LLC ("788 FRANKLIN REALTY") is a New York limited liability company with its principal place of business listed as 543 Bedford Avenue, Suite 264, in Brooklyn, New York.

14. Defendant WATERMARK CAPITAL GROUP LLC ("WATERMARK CAPITAL GROUP"), individually and doing business as "SDA/ WATERMARK CAPITAL MANAGEMENT," is a New York limited

liability company with its principal place of business listed as 185 Marcy Avenue, Suite 304, in Brooklyn, New York. Upon information and belief, WATERMARK CAPITAL GROUP, under the direction of founding partner YOEL KOHN a/k/a JOEL KOHN deliberately used the fictitious and unregistered name "SDA/WATERMARK CAPITAL MANAGEMENT" to fraudulently furnish tradeline data to consumer credit bureaus, misrepresenting Plaintiff's commercial lease as a personal loan while concealing the true identity and business purpose of the entity.

15. The false tradeline appearing on Plaintiff's consumer credit reports under the name "SDA/WATERMARK CAPITAL MANAGEMENT" lists its official business address as 30 North Gould Street, No. 22928 in Sheridan, Wyoming—a commercial mailbox facility widely linked to fraudulent shell companies. Consumer protection authorities, investigative journalists, and regulatory agencies—including the Better Business Bureau, the Wyoming Attorney General's Office, and *The Sheridan (Wyoming) Press*—have documented this location as a hub for corporate anonymity, deception, and regulatory evasion.

## IV.  FACTUAL ALLEGATIONS

### A.  Plaintiff's Personal Information Obtained Under False Pretenses

16. On or about July 1, 2020, Plaintiff Edward B. Hubbuch entered into a commercial lease with Defendant 788 FRANKLIN REALTY LLC for the premises at 569 Lincoln Place, Store #3, in Brooklyn, New York. (*A true and correct copy of Plaintiff's lease and accompanying documents is annexed hereto as **Exhibit A***)

17. This lease was strictly for commercial purposes—to operate Plaintiff's restaurant, Memphis Seoul—and contained no provisions authorizing consumer credit reporting, personal loan agreements, or enforcement by a third-party credit servicer.

### B.  Misrepresentation of the Guaranty as a Routine Document

18. On or about June 26, 2020, just days before Plaintiff's commercial lease commenced, Defendants presented Plaintiff with a separate document described as a harmless, perfunctory agreement, requiring his signature.

19. Defendants' agents misrepresented the nature and significance of the document, stating that it was merely routine paperwork related to lease formalities and "no big deal." In reliance on these assurances, Plaintiff provided his full Social Security Number ("SSN"), date of birth, and a copy of his New York State driver's license, as requested, and signed the document without knowledge that his personal information would later be used for fraudulent purposes. (*A true and correct copy of the Guaranty, with Plaintiff's personal identifying information redacted, is annexed hereto as **Exhibit B**)

20. While personal guaranties are common in commercial leasing, Defendants abused this provision in an unprecedented and unlawful manner by misusing Plaintiff's personal identifiers obtained through the Guaranty to fabricate a fraudulent personal loan tradeline in Plaintiff's name.

21. Plaintiff now alleges Defendants used this document as a pretext to unlawfully obtain Plaintiff's SSN, date of birth, and his New York State driver's license information, which they later misused to fabricate a false credit tradeline—a deceptive practice that constitutes violations of 15 U.S.C.

§ 1681s-2 (FCRA), identity theft under New York Penal Law § 190.78, and fraudulent misrepresentation under New York common law.

### C.    The Fraudulent Credit Reporting Scheme

22. Beginning in July 2020, Defendants knowingly and willfully furnished false tradeline data to TransUnion, Equifax, and Experian, among other consumer credit bureaus, misidentifying Plaintiff as a co-borrower on a personal loan allegedly owed to "SDA/WATERMARK CAPITAL MANAGEMENT," with an account number designated only as "CBD."

23. This tradeline wrongfully appeared on Plaintiff's personal credit reports as a "Loan" with the description "Loan Type - RENTAL AGREEMENT," despite the fact that no loan agreement ever existed and Plaintiff's lease was strictly commercial.

24. Defendants deliberately structured this tradeline to misrepresent Plaintiff's obligations, making it falsely appear as a personal debt rather than a business lease. This mischaracterization was not an innocent mistake but a calculated act, designed to apply financial pressure by manipulating Plaintiff's credit score whenever rent payments were late.

25. On June 11, 2025, the date of this filing, the reported balance on Plaintiff's TransUnion credit report exceeded $10,000, even though Plaintiff's restaurant was not in rental arrears. The account remains falsely listed as 120 days overdue, continuing to harm Plaintiff's creditworthiness and business operations. (*A true, correct, and annotated copy of this tradeline from Plaintiff's personal TransUnion credit report for June 11, 2025, is annexed hereto as __Exhibit C__*)

26. The fraudulent nature of this tradeline is further evidenced by the irregular formatting of the account name and number—"SDA/WATERMARK CAPITAL MANAGEMENT" is not a registered entity, and the account number designated only as "CBD" is highly unusual, suggesting an effort to conceal the origin of the reporting entity and evade scrutiny.

27. Plaintiff never authorized this tradeline, never signed a personal loan agreement with Defendants, and never consented to having his commercial lease obligations falsely reported as consumer debt. Defendants' actions constitute violations of the Fair Credit Reporting Act (15 U.S.C. § 1681s-2),

fraudulent misrepresentation, and identity theft under New York Penal Law
§ 190.78.

### D.    Defendant's Use of a Notorious Wyoming Shell Address to Conceal Fraudulent Activity

28. Upon information and belief, Defendant WATERMARK CAPITAL GROUP
LLC is controlled by Defendant YOEL KOHN a/k/a JOEL KOHN and
operates in conjunction with Defendant 788 FRANKLIN REALTY LLC.

29. The Wyoming address associated with the fraudulent credit tradeline—30
North Gould Street, Suite 22928, in Sheridan, Wyoming—is widely
recognized as a commercial mailbox facility used by fraudulent shell
companies. This address has been flagged by the Better Business Bureau, the
Wyoming Attorney General's Office, and multiple investigative journalists
for its role for more than a decade in housing thousands of anonymous
corporate entities engaged in financial deception, regulatory evasion, and
fraud. (*A true and correct copy of an August 6, 2021, article by The Sheridan
[Wyoming] Press detailing this controversy is annexed hereto as __Exhibit D__*)

30. The deliberate use by Defendant YOEL KOHN a/k/a JOEL KOHN of a remote dropbox nearly 2,000 miles from his actual business operations in Brooklyn, New York—especially one notorious for corporate fraud—strongly indicates intent to deceive and evade accountability. The placement of a fabricated credit tradeline under a fictitious entity name using a Wyoming shell address constitutes a deceptive trade practice, fraudulent credit reporting, and evidence of willful misconduct under 15 U.S.C. § 1681n.

### E.    Plaintiff's Financial Harm and Severe Consequences

31. Plaintiff first discovered the fraudulent "SDA/WATERMARK CAPITAL MANAGEMENT" tradeline in early 2025, confirming through an analysis of his TransUnion credit report that Defendants had continuously reported this nonexistent "delinquent loan" since the inception of his lease.

32. Neither the lease agreement nor any associated documents contained provisions authorizing this fraudulent credit reporting. Defendants' use of Plaintiff's SSN, date of birth, and his New York State driver's license information to fabricate a consumer loan tradeline was done knowingly,

intentionally, and without legal basis. As a direct result of this unlawful

conduct, Plaintiff has suffered:

- **A severely reduced credit score, impeding access to financing and business operations;**

- **Repeated denials of credit, loans, and refinancing, making expansion and financial management impossible;**

- **Increased interest rates, imposing additional financial burdens;**

- **Loss of financing opportunities, including the forced closure of Plaintiff's second restaurant location in Manhattan and abandonment of a commercial catering kitchen in Manhattan due to credit restrictions directly caused by Defendants' fraudulent reporting;** and

- **Severe reputational damage and emotional distress, stemming from the prolonged and unlawful credit defamation.**

33. Defendants' conduct was knowing, willful, intentional, deceptive, and

malicious, constituting federal statutory violations under the Fair Credit

Reporting Act (15 U.S.C. § 1681n, § 1681s-2), identity theft under New

York Penal Law § 190.78, fraudulent misrepresentation, and common-law

fraud.

# V. CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (15 U.S.C. § 1681s-2[a])
### (AGAINST ALL DEFENDANTS)

34. Plaintiff repeats and realleges all prior paragraphs.

35. Defendants knowingly and willfully engaged in a fraudulent scheme to misrepresent Plaintiff's commercial lease obligations as a personal loan tradeline, intentionally violating the accuracy requirements under 15 U.S.C. § 1681s-2(a).

36. Defendants' conduct was not the result of negligence or misclassification—it was a calculated effort to manipulate credit reporting systems, damage Plaintiff's financial stability, and exert economic pressure by falsely reporting delinquencies.

37. Plaintiff's credit file reflects a nonexistent consumer loan, falsely reported as 120 days overdue, despite the absence of any legitimate loan agreement.

38. This deliberate mischaracterization inflicted substantial financial, reputational, and emotional harm—causing repeated financing denials, severe credit score reduction, and irreversible business losses.

39. Plaintiff seeks statutory, actual, and punitive damages pursuant to 15 U.S.C. §§ 1681n and 1681o, along with injunctive relief requiring immediate deletion of the fraudulent tradeline.

## SECOND CAUSE OF ACTION

### CREDIT DEFAMATION
### (AGAINST ALL DEFENDANTS)

40. Plaintiff repeats and realleges all prior paragraphs.

41. Defendants intentionally published false and defamatory credit information to third-party consumer reporting agencies, falsely asserting Plaintiff owed a delinquent personal loan.

42. This was not a simple reporting error—Defendants knowingly fabricated the tradeline and deliberately maintained it to harm Plaintiff's financial standing.

43. Defendants acted with reckless disregard for the truth, falsely listing rent payments as consumer loan delinquencies, creating irreparable harm to Plaintiff's creditworthiness.

44. As a direct result of this intentional deception, Plaintiff suffered repeated denials of credit applications essential to business operations, substantial increases in interest rates due to damaged credit scores, and lost financing opportunities leading to business closures

45. Plaintiff is entitled to actual damages, reputational injury, and punitive relief due to Defendants' willful misconduct.

## THIRD CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION
### (AGAINST ALL DEFENDANTS)

46. Plaintiff repeats and realleges all prior paragraphs.

47. Defendants obtained Plaintiff's SSN, date of birth, and New York State driver's license information under false pretenses, deliberately misrepresenting the purpose of the Guaranty document to induce Plaintiff's compliance.

48. Instead of using Plaintiff's personal identifiers for legitimate leasing purposes, Defendants knowingly leveraged this information to fabricate a fraudulent consumer tradeline, falsely listing Plaintiff as a co-borrower on a nonexistent loan.

49. Plaintiff was led to believe that the Guaranty was routine lease paperwork, with no implications for personal credit reporting.

50. Defendants' actions were intentional, deceptive, and designed to manipulate financial institutions into restricting Plaintiff's access to credit.

51. This deliberate fraud entitles Plaintiff to compensatory and punitive damages, including financial loss, reputational harm, and emotional distress.

## FOURTH CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE
### (AGAINST ALL DEFENDANTS)

52. Plaintiff repeats and realleges all prior paragraphs.

53. Defendants intentionally furnished false and damaging credit tradeline data, knowing that it would interfere with Plaintiff's ability to obtain financing, vendor credit, and strategic business opportunities.

54. Defendants acted with deliberate malice and without justification, strategically fabricating the tradeline to induce financial distress and harm Plaintiff's business operations.

55. As a direct and foreseeable result of Defendants' fraudulent reporting, Plaintiff suffered denial of financing critical to business expansion, forced closure of a second restaurant location in Manhattan, loss of a commercial catering kitchen due to lack of accessible credit, and total deprivation of business opportunities cumulatively valued at over $1,000,000.

56. Defendants' pattern of financial deception directly obstructed Plaintiff's ability to operate and grow his business, entitling him to damages for lost business opportunities, financial harm, and reputational injury.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands that this Court enter judgment against Defendants YOEL KOHN a/k/a JOEL KOHN, 788 FRANKLIN REALTY LLC, and WATERMARK CAPITAL GROUP LLC, individually and doing business as "SDA/WATERMARK CAPITAL MANAGEMENT," as follows:

## PLAINTIFF'S PUNITIVE DAMAGES JUSTIFICATION

Defendants' actions were not merely negligent, but intentionally fraudulent, calculated to deceive financial institutions, obscure the identity of the reporting entity, and cause lasting harm to Plaintiff's creditworthiness and economic stability.

Punitive damages are therefor warranted under 15 U.S.C. § 1681n(a)(2) because:

- **Defendants knowingly misused Plaintiff's personal identifiers:** They fraudulently obtained Plaintiff's SSN, date of birth, and New York State driver's license information under false pretenses, misleading him into signing a routine Guaranty that was secretly repurposed to fabricate a fraudulent tradeline.

- **Defendants fabricated a false tradeline under a fictitious entity:** The reported creditor, "SDA/WATERMARK CAPITAL MANAGEMENT," is not a registered business entity, making its use in consumer credit reporting deliberately deceptive and unlawful.

- **<u>Defendants strategically used a Wyoming shell address to evade detection</u>:** The listing of 30 North Gould Street, Suite 22928, in Sheridan, Wyoming—a known corporate anonymity hub—shows a deliberate effort to obscure the fraudulent nature of the tradeline and avoid regulatory scrutiny.

- **<u>Defendants exhibited a pattern of deception and financial exploitation</u>:** This scheme was not an isolated incident but an intentional system of credit manipulation, designed to inflict severe harm on Plaintiff's financial standing for Defendants' benefit.

Given the malicious, fraudulent, and highly deceptive nature of Defendants' actions, Plaintiff seeks punitive damages sufficient to deter future misconduct and to hold Defendants accountable for their willful violations of the Fair Credit Reporting Act (15 U.S.C. § 1681n), fraudulent misrepresentation, and identity theft under New York Penal Law § 190.78.

## RELIEF REQUESTED

1.  Statutory damages under 15 U.S.C. § 1681n(a), up to $1,000 per violation;

2.  Actual damages for financial loss, lost business opportunities, reputational harm, and emotional distress in excess of $1,000,000;

3.  Punitive damages for Defendants' intentional and fraudulent conduct;

4.  Injunctive relief requiring the deletion of the unlawful tradeline from Plaintiff's consumer credit reports;

5.  Referral of this matter to the Consumer Financial Protection Bureau (CFPB), Federal Trade Commission (FTC), and criminal authorities for further investigation into Defendants' actions, including potential violations of federal and state fraud statutes; and

6.  Such other and further relief as this Court deems just and proper.

Dated: June 11, 2025
New York, New York

Respectfully submitted,

EDWARD B. HUBBUCH
394 Lincoln Place #A5
Brooklyn, N.Y. 11238
bhubbuch@gmail.com
(646) 544-7597

*Pro se*

# EXHIBIT A

**THIS AGREEMENT OF LEASE** (this "Lease"), made as of this 1st day of July 2020 by and between **788 Franklin Realty LLC** having an address at 543 Bedford Ave #264 ("Landlord") and **Bart Hubbuch d/b/a Memphis Seoul** , having an address at **569- 571 Lincoln Place** Tenant").

1.    <u>BASIC LEASE TERMS.</u>

    A.    <u>Definitions.</u>    The following definitions contained in this subsection A of this Article 1 shall have the meanings hereinafter set forth used throughout this Lease and the Exhibits and Schedules (if any) annexed hereto and made a part hereof.

    (i)    "<u>additional rent</u>" shall mean all sums of money, other than Rent which shall become due from and be payable by Tenant under this lease (for default in the payment of which Landlord shall have the same remedies as for a default in the payment of Rent).

    (ii)    ~~"Broker" shall mean~~ _____

    (iii)    "Building" the building known by the address: 569 Lincoln place  Store #3

    (iv)    "Commencement Date" shall mean the day of the execution of this lease

    (v)    " Rent Commencement Date : 7/1/2020

    (vi)    "Expiration Date" shall mean the day preceding the 3rd anniversary of the Commencement Date with one (1) _five__ (_5) year renewal option. See rider attached.

    (vii)

    (viii)    "Premises" shall a portion of the ground floor in the Building (not including any common areas).

    (ix)    "Real Property" shall mean the Building together with the plot of land upon which such building stands.

    (x)    "Rent" shall mean:

    (a) $2800.00 for the period from the Commencement Date through and including the day preceding the second anniversary of the Commencement Date;

    (b) $3200.00  for the period from the second anniversary Commencement Date through and including the day preceding the third anniversary of the Commencement Date;

    (c) $3328.00 for the period from the third anniversary of the Commencement Date through and including the day preceding the fourth anniversary of the Commencement Date;

"Security Deposit" shall mean the sum of $8400 (3 months of rent). Tenant shall sign a "good guy" guarantee.

B.    Demise.    Subject to and upon the terms and conditions of this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises.

C.    Term.    This Lease shall be for a term (the "Term") which commences on the Commencement Date and ends on the Expiration Date, unless sooner terminated pursuant to any of the terms, covenants or conditions of this Lease or pursuant to law.

D.    Rent.    Commencing 7/1/2020 , and continuing throughout the Term, Tenant shall pay Landlord the annual Rent set forth in Subsection A of this Article 1, payable without demand, on or in advance of the first day of each month in equal monthly installments, in lawful money (legal tender for public or private debts) of the United States of America, at the office of Landlord or such other place as Landlord may designate from time to time without any set-off, offset, abatement or deduction

2.    USE AND OCCUPANCY, Permitted Uses. It is expressly agreed and understood that Tenant shall use the Premises for a Restaurant use as permitted by law and no other purpose (the "Permitted Uses").

3.    ALTERATIONS.
A.    Alterations Within Premises.    Tenant shall not make or perform or permit the making or performance of, any alterations, installations, improvements, additions or other physical changes in or about the Premises ("Alterations") without Landlord's prior written consent. Subject to the prior written consent of Landlord, and to the provisions of this Article, Tenant, at Tenant's expense, may make Alterations in or to the interior of the Premises which are nonstructural, do not affect the Building's mechanical, electrical, plumbing, other Building systems or the structural integrity of the Building, do not affect any part of the Building other than the Premises, do not affect any service required to be furnished by Landlord to Tenant and which are performed only by contractors and mechanics first approved by Landlord and in compliance with all applicable laws.

B.    Restoration of Premises.    All furniture, furnishings and movable fixtures and removable partitions installed by Tenant must be removed from the Premises by Tenant, at Tenant's expense, prior to the Expiration Date.  All Alterations in and to the Premises which may be made by Landlord or Tenant prior to and during the Term, or any renewal thereof, shall become the property of Landlord upon the Expiration Date or earlier end of the Term or any renewal thereof, and shall not be removed from the Premises by Tenant unless Landlord, at Landlord's option by notice to Tenant prior to the Expiration Date, elects to have them removed from the Premises by Tenant, in which event the same shall be removed from the Premises by Tenant, at Tenant's expense, prior to the Expiration Date.  In the event Landlord elects to have Tenant remove such Alterations, Tenant shall repair and restore, in a good and workmanlike manner, any damage to the Premises or the Building caused by such removal, and deliver the building in its original condition (reasonable wear and tear excepted)..  Any of such Alterations or other property not so removed by Tenant at or prior to the Expiration Date or earlier termination of the Term shall become the property of Landlord, but nothing herein shall be deemed to relieve Tenant of responsibility for the cost of removal of any such Alterations or other property which Tenant is obligated to remove hereunder.

C.    Mechanics' Liens; Labor Conflicts.    Any mechanic's lien filed against the Premises, or the Real Property, for work claimed to have been done for, or materials claimed to have been furnished to,

2

Tenant, shall be discharged by Tenant within fifteen (15) days thereafter, at Tenant's expense.

4.    REPAIRS.  Tenant shall, throughout the Term, maintain and make all repairs to the Premises at Tenant's sole cost and expense. Tenant shall throughout the Term maintain and repair the fixtures and appurtenance in the Premises and the sidewalks at Tenant's sole cost and expense. Tenant shall be responsible for all snow, ice and debris removal from any of the sidewalks adjacent to the Premises.  All damage or injury to the Premises or to its fixtures, equipment and appurtenances, whether requiring structural or nonstructural repairs, shall be repaired promptly by Tenant, at its sole cost and expense, to the reasonable satisfaction of Landlord.    Notwithstanding the foregoing, all damage or injury to the Premises or to any other part of the Building, or to its fixtures, equipment and appurtenances, whether requiring structural or nonstructural repairs, to the extent caused by or to the extent resulting from the carelessness, omission, neglect or improper conduct of, or Alterations made by, or any work, labor, service or equipment done by Tenant or any subtenant, or the installation, use or operation of any property or equipment by Tenant or any of Tenant's subtenants, agents, employees, invitees or licensees, shall be repaired promptly by Tenant, only to the extent caused by Tenant, at its sole cost and expense, to the reasonable satisfaction of Landlord.  Tenant also shall repair all damage to the Building and the Premises caused by the moving of Tenant's fixtures, furniture or equipment. All the aforesaid repairs shall be of quality and class equal to the original work or construction and shall be made in accordance with the provisions of Article 3 hereof.  If Tenant fails after ten (10) days' notice to proceed with due diligence to make repairs required to be made by Tenant hereunder, or if, after the giving of any applicable notice and the expiration of any applicable cure period, Landlord elects to make any repairs in or to the Building or the facilities and systems thereof for which Tenant is responsible, the same may be made by Landlord, at the expense of Tenant, and the expenses thereof incurred by Landlord shall be collectible by Tenant as additional rent promptly after rendition of a bill or statement therefor.  Tenant shall give Landlord prompt notice of any defective condition in the Premises for which Landlord may be responsible hereunder.  There shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from Landlord, Tenant or others making, or failing to make, any repairs, alterations, additions or improvements in or to any portion of the Building including the erection or operation of any scaffolding, crane or derrick or sidewalk shed.

5.    REQUIREMENTS OF LAW.

    A.    Requirements of Law.  Tenant, at Tenant's sole expense, shall promptly comply with all present and future laws, statutes, orders, directives and regulations of federal, state, county, city and municipal authorities, departments, bureaus, boards, agencies, commissions and other sub-divisions thereof, and of any official thereof and any other governmental and quasi-public authority and all rules, orders, regulations or requirements of any government or quasi government body which shall now or hereafter impose any violation, order or duty upon Landlord or Tenant with respect to the Premises and with respect to the portion of the sidewalk adjacent to the Premises and as a result of the use, occupation or alteration thereof by Tenant with respect to the Building.  Tenant shall promptly remediate all violations and pay any and all fines associated with any violations.

3

6.    SUBORDINATION.

A.    Subordination. This Lease is subject and subordinate to each and every ground or underlying lease of the Real Property or the Building hereafter made by Landlord (collectively, the "Superior Leases") and to each and every trust indenture and mortgage (collectively the "Mortgages") which may now or hereafter affect the Real Property, the Building or any such Superior Lease and the leasehold interest created thereby, and to all renewals, extensions, supplements, amendments, modifications, consolidations, and replacements thereof or thereto, substitutions therefor and advances made thereunder. This clause shall be self operative and no further instrument of subordination shall be required to make the interest of any lessor under a Superior Lease, or trustee or mortgagee of a Mortgage superior to the interest of Tenant hereunder. In confirmation of such subordination, however, Tenant shall execute promptly any certificate that Landlord may reasonably request. If, in connection with the financing of the Real Property, the Building or the interest of the lessee under any Superior Lease, any lending institution shall request reasonable modifications of this Lease, provided such modifications do not increase the obligations or adversely affect the rights of Tenant under this Lease, Tenant covenants to make such modifications.

7.    INSURANCE.

A.    Liability Insurance. Tenant shall obtain at its own expense and keep in full force and effect during the Term, a policy of commercial general liability insurance (including, without limitation, insurance covering Tenant's contractual liability under this Lease), under which Tenant is named as the insured, and Landlord, Landlord's managing agent, the present and any future mortgagee of the Real Property or the Building and/or such other designees specified by Landlord from time to time, are named as additional insureds. Such policy shall contain a provision that no act or omission of Tenant shall affect or limit the obligation of the insurance company to pay the amount of any loss sustained. Such policy shall also contain a provision which provides the insurance company will not cancel or refuse to renew the policy, or change in any material way the nature or extent of the coverage provided by such policy, without first giving Landlord at least thirty (30) days' written notice by certified mail, return receipt requested, which notice shall contain the policy number and the names of the insureds and policy holder. The minimum limits of liability shall be a combined single limit with respect to each occurrence in an amount of not less than $2,000,000 for injury (or death) and damage to property or such greater amount as Landlord may, from time to time, reasonably require. Such coverage may be maintained by a combined single limit policy in the amount of $1,000,000.00 and an "umbrella" or excess coverage policy in the amount of $1,000,000.00. Tenant shall also maintain at its own expense during the Term a policy of workers' compensation insurance providing statutory benefits for Tenant's employees and employer's liability. Tenant shall provide to Landlord upon execution of this Lease and at least thirty (30) days prior to the termination of any existing policy, a certificate evidencing the effectiveness of the insurance policies required to be maintained hereunder which shall include the named insured, additional insured, carrier, policy number, limits of liability, effective date, the name of the insurance agent and its telephone number. Tenant shall provide Landlord with a complete copy of any such policy upon written request of Landlord.

B.    All-Risk Insurance.    Tenant shall also maintain at its own expense during the Term a policy against fire and other casualty on an "all risk" form covering all Alterations, construction and other improvements installed within the Premises, whether existing in the Premises on the date hereof or hereinafter installed by or on behalf of Landlord or Tenant, and on all furniture, fixtures, equipment,

4

personal property and inventory of Tenant located in the Premises and any property in the care, custody and control of Tenant (fixed or otherwise) sufficient to provide 100% full replacement value of such items.

8.    DESTRUCTION OF THE PREMISES; PROPERTY LOSS OR DAMAGE.

A.    Repair of Damage.    If the Premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give immediate notice thereof to Owner and this Lease shall continue in full force and effect except as hereinafter set forth. If the Premises shall be damaged by fire or other casualty, then the Premises shall be repaired and restored to its condition preceding the damage in accordance with the provisions of this Article 8. Whenever in this Article 8 reference is made to restoration of the Premises, (i) Tenant's obligation shall be as to all property within the Premises including Tenant's furniture, fixtures, equipment and other personal property, any and all Alterations, construction or other improvements made to the Premises by or on behalf of Tenant and any other leasehold improvements existing in the Premises on the day of the casualty, all of which shall be restored and replaced at Tenant's sole cost and expense and (ii) Landlord's obligation, if any, shall be as to the shell, which constitutes the structure and roof of the Building and the mechanical and other building-wide systems up to the point of connection into the Premises. After any such casualty, Tenant shall cooperate with Landlord's restoration by removing from the Premises as promptly as reasonably possible, all of Tenant's salvageable inventory and movable equipment, furniture, and other property. Tenant's liability for Rent shall resume on the date on which the Premises are substantially ready for Tenant's occupancy. Landlord shall have no liability to Tenant, and Tenant shall not be entitled to terminate this Lease, if such repairs and restoration are not in fact completed within Landlord's estimated time period. The Rent until such repairs shall be made shall be reduced in the proportion which the area of the part of the Premises which is not usable by Tenant bears to the total area of the Premises; provided, however, should Tenant reoccupy a portion of the Premises for the conduct of its business prior to the date such repairs are made, the Rent shall be reinstated with respect to such reoccupied portion of the Premises and shall be payable by Tenant from the date Landlord delivers possession of the Premises to Tenant.

B.    Repair Delays.  Landlord shall not be liable for reasonable delays which may arise by reason of the claim adjustment with any insurance company on the part of Landlord and/or Tenant, and for reasonable delays on account of "labor troubles" or any other cause beyond Landlord's control.

C.    Property Loss or Damage.    Neither Landlord nor its agents shall be liable for any injury or damage to persons or property or interruption of Tenant's business resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of the Building or from the pipes, appliances or plumbing works or from the roof, street or subsurface or from any other place or by dampness or by any other cause of whatsoever nature; nor shall Landlord or its agents be liable for any such damage caused by other tenants or persons in the Building or caused by construction of any private, public or quasipublic work. Anything in this Article 8 to the contrary notwithstanding, nothing in this Lease shall be construed to relieve Landlord from responsibility directly to Tenant for any loss or damage caused directly to Tenant wholly or in part by the gross negligence or willful misconduct of Landlord.

9.    CONDEMNATION.    If the whole of the Real Property, the Building or the Premises shall be acquired or condemned for any public or quasipublic use or purpose, this Lease and the Term shall end as of the date of the vesting of title with the same effect as if said date were the Expiration Date.

5

10.    ASSIGNMENT AND SUBLETTING. Prohibition Without Consent.    Tenant    expressly covenants that it shall not (i) assign or otherwise transfer this Lease or the term and estate hereby granted, (ii) mortgage, pledge or encumber this Lease or the Premises or any part thereof in any manner by reason of any act or omission on the part of Tenant, or (iii) sublet the Premises or any part thereof, without the written consent of Landlord. If this Lease be assigned, or if the Premises or any part thereof be sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the Rent herein reserved, but no assignment, underletting, occupancy or collection shall be deemed a waiver of the provisions hereof, the acceptance of the assignee, undertenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. The consent by Landlord to an assignment or underletting shall not in any way be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment or underletting. In no event shall any permitted subtenant assign or encumber its sublease or further sublet all or any portion of its sublet space, or otherwise suffer or permit the sublet space or any part thereof to be used or occupied by others, without Landlord's prior written consent in each instance. Any assignment, sublease, mortgage, pledge, encumbrance or transfer in contravention of the provisions of this Article 10 shall be void.

11.    CONDITION OF THE PREMISES. Tenant has inspected the Premises and is thoroughly acquainted with its condition, and takes the same "AS IS", and Tenant acknowledges that the taking of possession of the premises by Tenant shall be conclusive evidence that the Premises are in good and satisfactory condition at the time such possession was so taken.

12.    ACCESS TO PREMISES.

A.    Access by Landlord.    Tenant shall permit Landlord, Landlord's agents and public utilities servicing the Building to erect, use, maintain and replace, concealed ducts, pipes and conduits in and through the Premises. Landlord, Landlord's agents and/or affiliates, and the holder of any Mortgage shall each have the right to enter the Premises upon reasonable notice to (i) examine the same, (ii) to show them to prospective purchasers, mortgagees or lessees of the Building or space therein, (iii) to make such decorations, repairs, replacements, alterations, improvements or additions as shall be necessary or desirable for the proper operation of the Building or to any other portion of the Building or which Landlord may elect to perform following Tenant's failure to make repairs or perform any work which Tenant is obligated to perform under this Lease, (iv) for the purpose of complying with laws, regulations or other requirements of government authorities and (v) to perform remedial work after the failure of Tenant to perform the same in accordance with the terms of this Lease. Landlord shall be allowed, during the progress of any such work in and about the Premises, to take all necessary material and equipment into and upon the Premises and to store them within the Premises while minimizing any negative impact on Tenant's business, without the same constituting an eviction or constructive eviction of Tenant in whole or in part and the Rent shall in not abate while any decorations, repairs, replacements, alterations, improvements or additions are being made, by reason of loss or interruption of business of Tenant, or otherwise. During the six (62) months prior to the Expiration Date, upon reasonable prior notice to Tenant, Landlord may exhibit the Premises to prospective tenants thereof. If Tenant shall not be personally present to open and permit an entry into the, Landlord or Landlord's agents may enter the same by a master key, or may forcibly enter the same, without rendering Landlord or such agents liable therefor (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's property), and without in any manner affecting the obligations and covenants of this Lease. Nothing herein contained, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever, for the care, supervision or repair of the

6

Building or any part thereof, other than as herein provided.

     B.    Other Landlord Privileges.    Landlord shall have the right at any time, without the same constituting an actual or constructive eviction and without incurring any liability to Tenant therefor, to change the name, number or designation by which the Building is commonly known. Tenant acknowledges that Landlord may (but shall have no obligation to) perform repairs, improvements, alterations and/or substantial renovation work in and to the mechanical and other systems serving the Building (which work may include improvements to the facade of the Building, which may require that scaffolding and/or a sidewalk bridge be placed in front of the Building, and the replacement of window glass, requiring access to the same from within the Premises). Landlord shall incur no liability to Tenant, nor shall Tenant be entitled to any abatement of Rent on account of any noise, vibration or other disturbance to Tenant's business at the Premises (provided that Tenant is not denied access thereto) which shall arise out of the performance by Landlord of the aforesaid repairs, alterations, additions, improvements, alterations and renovations of the Building or any part thereof and Tenant hereby agrees to release Landlord of and from any claims (including without limitation, claims arising by reason of loss or interruption of business) of every kind and nature whatsoever arising under or in connection therewith.

13.    CERTIFICATE OF OCCUPANCY.  Tenant shall not at any time use or occupy the Premises in violation of the certificate of occupancy issued for the Premises or for the Building

14.    LANDLORD'S LIABILITY.  The obligations of Landlord under this Lease shall not be binding upon Landlord named herein after the sale, conveyance, assignment or transfer by such Landlord (or upon any subsequent landlord after the sale, conveyance, assignment or transfer by such subsequent landlord) of its interest in the Building or the Real Property, as the case may be and Landlord named herein shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder arising on or after the date of such sale, conveyance, assignment or transfer, other than to transfer any security deposit to any subsequent landlord. Neither the shareholders, members, directors or officers of Landlord, if Landlord is a corporation, nor the partners or members comprising Landlord (nor any of the shareholders, members, directors or officers of such partners), if Landlord is a partnership or other business entity (collectively, the "Parties"), shall be liable for the performance of Landlord's obligations under this Lease. Tenant shall look solely to Landlord to enforce Landlord's obligations hereunder and shall not seek any damages against any of the Parties. The liability of Landlord for Landlord's obligations under this Lease shall not exceed and shall be limited to Landlord's interest in the Building and the Real Property and Tenant shall not look to or attach any other property or assets of Landlord or the property or assets of any of the Parties in seeking either to enforce Landlord's obligations under this Lease or to satisfy a judgment for Landlord's failure to perform such obligations. In no event shall Landlord (or any of the officers, trustees, directors, partners, beneficiaries, joint ventures, members, stockholders or other principals or representatives and the like, disclosed or undisclosed, thereof) ever be liable for incidental or consequential damages.

15.    DEFAULT.

     A.    Events of Default; Conditions of Limitation.    This Lease and the term hereby granted are subject to the limitations that upon the occurrence, at any time prior to or during the Term, of any one or more of the following events (referred to as "Events of Default"):

        (i)     if Tenant shall default in the payment when due; or

(ii)    if Tenant shall default in the observance or performance of any term, covenant or condition of this Lease on Tenant's part to be observed or performed (other than the covenants for the payment of Rent and additional rent) and Tenant shall fail to remedy such default within fifteen (15) days after written notice by Landlord to Tenant of such default, or, if such default is of such a nature that it cannot be completely remedied within said period of fifteen (15) days, if Tenant shall not commence within said period of fifteen (15) days, or shall not thereafter diligently prosecute to completion all steps necessary to remedy such default; or

(iii)    if Tenant's interest in this Lease shall devolve upon or pass to any person, whether by operation of law or otherwise, except as may be expressly permitted under Article 10 hereof; or

(vi)    if this Lease shall be rejected under §235 of Title 11 of the U.S. Bankruptcy Code;

then, in any of said cases, at any time prior to or during the Term, of any one or more of such Events of Default, Landlord, at any time thereafter, at Landlord's option, may give to Tenant a ten (10) days' notice of termination of this Lease and, in the event such notice is given, this Lease and the Term shall come to an end and expire (whether or not the Term shall have commenced) upon the expiration of said ten (10) days with the same effect as if the date of expiration of said ten (10) days were the Expiration Date, but Tenant shall remain liable for damages as provided in Article 16 hereof.

16.    REMEDIES AND DAMAGES.

A.    Landlord's Remedies.    (i)    If Tenant shall default in the payment when due of any installment of Rent or in the payment when due of any additional rent, or if any execution or attachment shall be issued against Tenant or any of Tenant's property whereupon the Premises shall be taken or occupied or attempted to be taken or occupied by someone other than Tenant, or if this Lease and the Term shall expire and come to an end as provided in Article 15:

(a)    Landlord and its agents and servants may immediately, or at any time after such default or after the date upon which this Lease and the Term shall expire and come to an end, reenter the Premises or any part thereof, either by summary proceedings, or by any other applicable action or proceeding, (without being liable for indictment, prosecution or damages therefor), and may repossess the Premises and dispossess Tenant and any other persons from the Premises and remove any and all of their property and effects from the Premises in accordance with the law; and

(b)    Landlord, at Landlord's option, may relet the whole or any part or parts of the Premises from time to time, either in the name of Landlord or otherwise, to such tenant or tenants, for such term or terms ending before, on or after the Expiration Date, at such rental or rentals and upon such other conditions, which may include concessions and free rent periods, as Landlord, in its sole discretion, may determine. Landlord shall have no obligation to relet the Premises or any part thereof and shall in no event be liable for refusal or failure to relet the Premises or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise to affect any such liability; Landlord, at Landlord's option, may make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.

B.    <u>Damages.</u>   (i)   If this Lease and the Term shall expire and come to an end as provided in Article 15, or by or under any summary proceeding or any other action or proceeding, or if Landlord shall reenter the Premises as provided in subsection A of this Article 16, or by or under any summary proceeding or any other action or proceeding, then, in any of said events:

(a)   Tenant shall pay to Landlord all Rent and additional rent and other charges payable under this Lease by Tenant to Landlord to the date upon which this Lease and the Term shall have expired and come to an end or to the date of reentry upon the Premises by Landlord, as the case may be;

(b)   Tenant also shall be liable for and shall pay to Landlord, as damages, any deficiency (referred to as "Deficiency") between the Rent reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term and the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of subsection A(i) of this Article 16 for any part of such period (first deducting from the rents collected under any such reletting all of Landlord's expenses in connection with the termination of this Lease, or Landlord's reentry upon the Premises and with such reletting including, but not limited to, all repossession costs, brokerage commissions, advertising, legal expenses, attorneys' fees and disbursements, alteration costs and other expenses of preparing the Premises for such reletting); any such Deficiency shall be paid in monthly installments by Tenant on the days specified in this Lease for payment of installments of Rent, Landlord shall be entitled to recover from Tenant each monthly Deficiency as the same shall arise, and no suit to collect the amount of the Deficiency for any month shall prejudice Landlord's right to collect the Deficiency for any subsequent month by a similar proceeding; and

C.    <u>Legal Fees.</u>   (i)   Tenant hereby agrees to pay, as additional rent, all reasonable attorneys' fees and disbursements (and all other court costs or expenses of legal proceedings) which Landlord may incur or pay out by reason of, or in connection with any action or proceeding brought by Landlord against Tenant.

## 17.    <u>FEES AND EXPENSES.</u>

A.    <u>Curing Tenant's Defaults.</u>  If Tenant shall default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under or by virtue of any of the terms or provisions in any Article of this Lease, after the giving of notice (if required), Landlord may immediately or at any time thereafter and without notice perform the same for the account of Tenant. If Landlord makes any expenditures or incurs any obligations for the payment of money to a third party in connection with any such default by Tenant or the cure thereof including, but not limited to, any damages or fines or any reasonable attorneys' fees and disbursements in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by Tenant to Landlord within twenty (20) days of rendition of any bill or statement to Tenant therefor. If the Term hereof shall have expired at the time Landlord sustains or incurs such expenditures, such sums shall be recoverable by Landlord, as damages.

B.    <u>Late Charges.</u>  If Tenant shall fail to make payment of any installment of Rent or any additional rent within seven (7) days after the date when such payment is due, Tenant shall pay to Landlord, in addition to such installment of Rent or such additional rent, as the case may be, as a late charge and as additional rent, a sum based on a rate equal to 5% of the of the unpaid installment of Rent and/or any additional rent, in addition to such late charge, Tenant acknowledges and agrees that, except as otherwise expressly provided herein, if Tenant fails to dispute any item of additional rent within ten

(10) days of receipt of a bill or notice therefor, Tenant shall be deemed to have waived its right to dispute the same.

18. END OF TERM.

    A.    Surrender of Premises.    Upon the expiration or other termination of the Term, Tenant shall quit and surrender to Landlord the Premises, broom clean, in good order and condition, ordinary wear and tear and damage for which Tenant is not responsible under the terms of this Lease excepted, and Tenant shall remove all Alterations and property pursuant to Article 3 hereof

    B.    Holdover by Tenant.    If possession of the Premises is not surrendered to Landlord by the Expiration Date or sooner termination of the Term, in addition to any other rights or remedy Landlord may have hereunder or at law, Tenant shall pay to Landlord for each month and for each portion of any month during which Tenant holds over in the Premises after the Expiration Date or sooner termination of this Lease, a sum equal to two times the aggregate of that portion of the Rent and the additional rent which was payable under this Lease during the last month of the Term.

19.    INABILITY TO PERFORM. This Lease and the obligation of Tenant to pay Rent and additional rent hereunder and perform all of the other covenants and agreements hereunder on the part of Tenant to be performed shall in nowise be affected, impaired or excused because Landlord is unable to fulfill any of its obligations under this Lease expressly or impliedly to be performed by Landlord or because Landlord is unable to make, or is delayed in making any repairs, additions, alterations, improvements or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of strikes or labor troubles or by accident or by any cause whatsoever reasonably beyond Landlord's control, including but not limited to, laws, governmental preemption in connection with a National Emergency or by reason of any rule, order or regulation of any federal, state, county or municipal authority or any department or subdivision thereof or any government agency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency or when, in the judgment of Landlord, temporary interruption of such services is necessary by reason of accident, mechanical breakdown, or to make repairs, alterations or improvements.

20.    BILLS AND NOTICES. Except as otherwise expressly provided in this Lease, any bills, statements, notices, demands, requests or other communications given or required to be given under this Lease shall be deemed sufficiently given or rendered if in writing, sent by registered or certified mail (return receipt requested) addressed as follows or to such other address as either Landlord or Tenant may designate as its new address for such purpose by notice given to the others in accordance with the provisions of this Article

If to Landlord: 543 Bedford ave #264
Brooklyn, NY 11211


If to Tenant: At the Premises

or at any place where Tenant or any agent or employee of Tenant may be found if mailed subsequent to Tenant's vacating, deserting, abandoning or surrendering the Premises, or prior to taking possession of the Premises. Tenant hereby acknowledges and agrees that any such bill, statement, demand, notice, request

or other communication may be given by Landlord's agent on behalf of Landlord. Any such bill, statement, demand, notice, request or other communication shall be deemed to have been rendered or given on the date which is two (2) days after the date when it shall have been mailed as provided in this Article 20.

21.    SERVICES.

A.    Intentionally Omitted

B.    Utilities. Landlord shall at the sole cost and expense of the Landlord install a direct meter for the leased portion of the premises and upon such installation Tenant shall pay the electric and water bills directly to the public utility company. Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of existing feeders to the building or the risers or wiring installation and Tenant may not use any electrical equipment which, in Landlord's
opinion, reasonably exercised, will overload such installations or interfere with the use thereof by other tenants of the building. The change at any time of the character of electric service shall in no wise make Landlord liable or responsible to Tenant, for any loss, damages or expenses which Tenant may sustain. Tenant to contract their own trash pickup.

C.    Interruption of Services.   Landlord reserves the right to stop service of the heating, the elevator, electrical, plumbing or other mechanical systems or facilities in the Building and cleaning services when necessary, by reason of accident or emergency, or for repairs, additions, alterations, replacements, decorations or improvements in the judgment of Landlord desirable or necessary to be made, until said repairs, additions, alterations, replacements, decorations or improvements shall have been completed. Landlord shall have no responsibility or liability for interruption, curtailment or failure to supply heat, outside air, elevator, electrical, plumbing, electricity or cleaning when prevented by exercising its right to stop service or by strikes, labor troubles or accidents or by any cause whatsoever reasonably beyond Landlord's control, or by failure of independent contractors to perform or by laws, orders, rules or regulations of any federal, state, county or municipal authority, or failure of suitable fuel supply, or inability by exercise of reasonable diligence to obtain suitable fuel or by reason of governmental preemption in connection with a National Emergency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency.  The exercise of such right or such failure by Landlord shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any compensation or to any abatement or diminution of Rent, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise.

22.    PROPERTY TAXES tenant responsible for 6% on property taxes

23.    SECURITY DEPOSIT. Tenant shall deposit with Landlord on the signing of this Lease the Security Deposit (as defined in Article 1 of this Lease) as security for the faithful performance and observance by Tenant of the terms, conditions and provisions of this Lease, including without limitation the surrender of possession of the Premises to Landlord herein provided. It is agreed that in the event Tenant defaults in respect of any of the terms, provisions and conditions of this Lease, including, but not limited to, the payment of Rent and additional rent, Landlord may apply or retain the whole or any part of the Security Deposit so deposited to the extent required for the payment of any Rent and additional rent or any other

11

sum as to which Tenant is in default or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease, including but not limited to, any damages or deficiency in the reletting of the Premises, whether such damages or deficiency accrue or accrues before or after summary proceedings or other reentry by Landlord. If Landlord applies or retains any part of the Security Deposit so deposited, Tenant, within seven (7) days' after notice from Landlord, shall deposit with Landlord the amount so applied or retained so that Landlord shall have the full Security Deposit on hand at all times during the Term. The failure by Tenant to deposit such additional amount within the foregoing time period shall be deemed a material default pursuant to Article 15 of this Lease. If Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the Security Deposit shall be returned to Tenant after the Expiration Date and after delivery of the entire possession of the Premises to Landlord. In the event of a sale of the Real Property or the Building or leasing of the Building, Landlord shall have the right to transfer the Security Deposit to the vendee or lessee and Landlord shall thereupon be released by Tenant from all liability for the return of the Security Deposit; and Tenant agrees to look solely to the new Landlord for the return of the Security Deposit; and it is agreed that the provisions hereof shall apply to every transfer or assignment made of the Security Deposit to a new Landlord. Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the Security Deposit and that neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance. Tenant specifically understands, acknowledges and agrees that the Security Deposit may be commingled with other funds.

24.    BROKER. Tenant represents and warrants that Tenant has not dealt with any broker in connection with this Lease other than Broker as defined in Article 1 of this Lease, and that insofar as Tenant knows no other broker negotiated this Lease or is entitled to any commission in connection therewith; and Tenant covenants and agrees to pay, hold harmless and indemnify Landlord from and against any and all cost, expense (including reasonable attorney's fees) or liability for any compensation, commissions or charges claimed by any broker or agent, with respect to this Lease or the negotiations thereof, arising from Tenant's acts, conduct or conversations. The execution and delivery of this Lease by Landlord shall be conclusive evidence that Landlord has relied upon the foregoing representation and warranty. This Paragraph shall survive the expiration or sooner termination of this Lease.

25.    INDEMNITY. Tenant shall not do or permit any act or thing to be done upon the Premises which may subject Landlord to any liability or responsibility for injury, damages to persons or property or to any liability by reason of any violation of law or of any legal requirement of public authority, but shall exercise such control over the Premises as to fully protect Landlord against any such liability. Tenant agrees to indemnify and save harmless Landlord from and against all liabilities, obligations, damages, penalties, claims, costs and expenses, including reasonable attorney fees, incurred or arising from (i) any act, omission or negligence of Tenant, its contractors, licensees, agents, employees, invitees or visitors, including any claims arising from any act, omission or negligence of Landlord or Landlord or Tenant; (ii) any accident, injury or damage whatsoever caused to any person or to the property of any person and occurring during the Term in or about the Premises, (iii) any accident, injury or damage to any person, entity or property, occurring outside of the Premises but anywhere within or about the Real Property, where such accident, injury or damage results or is claimed to have resulted from an act or omission of Tenant or Tenant's agents, employees, invitees or visitors, including any claims arising from any act, omission or negligence of Landlord  and Tenant, (iv) any breach, violation or nonperformance of any covenant, condition or agreement in this Lease set forth and contained on the part of Tenant to be fulfilled, kept, observed and performed after the giving of any applicable notice and the expiration of any applicable cure period and (v) Tenant, or any of Tenant's contractors, licensees, agents,  employees, invitees or visitors causing or

12

permitting any hazardous substance to be brought upon, kept or used in or about the Premises or the Real Property or any seepage, escape or release of such hazardous substances. Tenant shall not indemnify or save harmless Landlord to the extent such injury or damage is caused by or is due to the gross negligence of Landlord, or its agents, servants or employees, in which event Landlord agrees to indemnify Tenant in similar manner to the indemnification herein.

26.    MISCELLANEOUS.

A.    Estoppel Certificates. From time to time, within ten (10) days next following request by either Landlord or the mortgagee of a Mortgage, the Tenant shall deliver to the Landlord or such mortgagee, as the case may be, a written statement executed and acknowledged by the Landlord, in form satisfactory to the Landlord or such mortgagee, (i) stating that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (ii) setting forth the date to which the Rent, additional rent and other charges hereunder have been paid, together with the amount of fixed base monthly Rent then payable, (iii) stating Landlord is not in default under this Lease, (iv) stating the amount of the security deposit under this Lease, (v) stating whether there are any subleases affecting the Premises, (vi) stating the address of the requested party to which all notices and communications under the Lease shall be sent, (vii) stating the Commencement Date and the Expiration Date, and (viii) as to any other matters reasonably requested by the Landlord or such mortgagee. Tenant acknowledges that any statement delivered pursuant to this subsection B may be relied upon by any purchaser or owner of the Real Property or the Building, or Landlord's interest in the Real Property or the Building or any Superior Lease, or by any mortgagee of a Mortgage, or by any assignee of any mortgagee of a Mortgage, or by any lessor under any Superior Lease.

B.    Signage. Tenant shall not install or affix or permit the installation or affixation of any signs, temporary or permanent, to the exterior of the Premises or of the Building, or which are visible from the outside of the Premises, without Landlord's prior written consent, which shall not be unreasonably withheld.

27.    HAZARDOUS SUBSTANCES. Tenant shall not permit the presence, handling, use, storage or transportation of Hazardous Substances in or about the Premises or the Building and Tenant shall, at its sole cost and expense, perform any and all Remedial Work arising from, growing out of or related to any breach of the foregoing covenant by Tenant.

28. This Agreement may be executed by facsimile signature and in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

## TENANT ESTOPPEL CERTIFICATE

The undersigned Memphis Seoul LLC("Tenant") is the Tenant and 788 Franklin Realty LLC ("Landlord") is the Landlord under that certain lease dated 7/1/2020-6/30/2023 (the "Lease") with respect to Tenant's occupancy of approximately ___600___ square feet of the premises situated at and known as 569 Lincoln Place aka 788 Franklin . Landlord has informed Tenant that Signature Bank ("Signature") has committed to make to Landlord a permanent mortgage loan, which will be secured by a first mortgage in respect of the aforesaid premises and a collateral assignment of rents and leases.

Tenant, with full knowledge that Signature, in making the aforementioned mortgage loan, is relying upon the statements contained herein, does hereby certify and warrant to Signature that:

1.    The Lease is in full force and effect, has not been modified or amended, and is binding and enforceable as against Tenant in accordance with its terms.

2.    The commencement date of the Lease is 7/1/2020.    Tenant has taken possession of the space demised under the Lease.  All alterations, improvements and work to be performed by Landlord, if any, have been completed in a manner fully satisfactory to Tenant. The termination date of the Lease is 6/30/2023.

3.    The monthly rent under the Lease is $2800.00. The base rent, additional rent and all other charges under the Lease have been paid by Tenant through the period ending 4/29/2021.  No prepayment of rent under the Lease more than one month in advance has been made to date or will be without Signature's written consent.

1

4.      Neither Tenant nor Landlord is in breach of default under the Lease, and Tenant knows of no event which, with the passage of time or the giving of notice or both, would constitute a breach or default under the Lease by Tenant or Landlord.

5.      Neither Tenant nor Landlord has commenced any action or received any notice for the purpose of terminating the Lease.

6.      There are no offsets, defenses, abatements, claims, counterclaims or deductions with respect to the payment of base rent, additional rent or any other sums payable under the Lease.

7.      The Lease and Tenant's rights, title and interest under the Lease are subject and subordinate to the lien of the first mortgage and the collateral assignment securing Signature's permanent mortgage loan.

8.      Upon the receipt by Tenant of any written notice by Signature to do so, all base rent, additional rent and other sums payable to Landlord under the Lease shall be paid by Tenant to Signature until further notice from Signature.

9.      This Agreement shall be binding upon Tenant and its successors and

2

assigns and shall inure to the benefit of and be enforceable by Signature and its successors, assigns and designees, including any purchaser at a foreclosure (which successors, assigns, designees, purchaser, person or entity shall be deemed to be included within the term "Signature" for purposes of this Agreement).

3

**IN WITNESS WHEREOF,** Tenant has duly executed, acknowledged and delivered this Certificate as of the date set forth below.

> TENANT   Memphis Seoul LLC
>
> By:   *Edward B. Hubbuch*
>
> Dated:   May 3, 2021

STATE OF NEW YORK      }
                                             } ss.:
COUNTY OF _____ }

　　　　　On the _____ day of _____, 20__, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me the he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　Notary Public

# EXHIBIT B

GUARANTY

FOR VALUE RECEIVED and in consideration for, and as an inducement to 788 FRANKLIN REALTY LLC, as Landlord, for making the Lease dated as of July 1st, 2020, with MEMPHIS SEOUL, LLC as Tenant, for STORE 3 at 788 FRANKLIN AVENUE, BROOKLYN, NEW YORK (a/k/a 571 Lincoln Place), the undersigned, jointly and severally guarantee to Landlord, Landlord's successors and/or assigns, the full performance and payment of all rents and additional rent payable under the Lease, and as provided in said Lease, without requiring any notice of nonpayment, nonperformance, or nonobservance, or proof, or notice or demand whereby to charge the undersigned therefor, all of which the undersigned hereby expressly waive; and the undersigned expressly agree that the validity of this Guaranty and the obligations of the Guarantor hereunder shall in no way be terminated, affected or impaired by reason of the assertion or non-assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the within Lease.  The undersigned further covenant and agree that this Guaranty shall remain and continue in full force and effect as to any renewal, modification or extension of this Lease and during any period when Tenant is occupying the premises as a "Statutory Tenant".  As further inducement to Landlord to make this Lease and in consideration thereof, Landlord and the undersigned covenant and agree that in any action or proceeding brought by either Landlord or the undersigned against the other on any matters whatsoever arising out of, under or by virtue of the terms of this Lease or of this Guaranty that Landlord and the undersigned shall and do hereby waive trial by jury.

Anything herein to the contrary notwithstanding, upon receipt by Landlord of a ninety (90) day written notice of Tenant's intent to vacate and terminate the lease and payment of all obligations due for rent, and any additional rent due from Tenant which arose or accrued on or prior to the Surrender Date, and a duly executed and acknowledged Surrender Declaration in which Tenant confirms to Landlord that Tenant any anyone claiming through Tenant has vacated the demised Premises as of a certain date, that the space is unoccupied and available for re-rental, and that no one else besides Landlord has any right to the fixtures and improvements remaining in the space (the "Surrender Declaration") together with all keys to the premises and removal by Tenant of all its personal property therefrom (such date that Landlord actually receives the Surrender Declaration and all keys shall be known as the "Surrender Date"), the Guarantor shall be released from all liability with respect to any monthly rent or other obligations of Tenant under the Lease arising or accruing after the Surrender Date. In such event, the security deposit shall be retained by the Landlord without any claim from the Tenant.

Bart Hubbuch
SS# ███████
DOB: ███████

Sworn to before me this
26th day of June, 2020

_____
Notary Public



# EXHIBIT C

service.**transunion.com**/dss/disclosureCategories.page

## Accounts with Adverse Information

Adverse information typically remains on your credit file for up to 7 years from the date of the delinquency. To help you understand what is generally considered adverse, we have added >brackets< to those items in this report. For your protection, your account numbers have been partially masked, and in some cases scrambled. Please note: Accounts are reported as "Current; Paid or paying as agreed" if paid within 30 days of the due date. Accounts reported as Current may still incur late fees or interest charges if not paid on or before the due date.

| Account Name | Account Number | Balance | Monthly Payment |
|---|---|---|---|



| | | | |
|---|---|---|---|
| ∧   SDA/WATERMARK CAPITAL MANAGEMENT | CBD* * | $10,850 | - - - |

### Account Information

| | |
|---|---|
| Address | 30 N GOULD ST,#22928 SHERIDAN, WY 82801 |
| Phone | (888) 851-5210 |
| Date Opened | 07/01/2020 |
| Responsibility | Joint Account |
| Account Type | Open Account |
| Loan Type | RENTAL AGREEMENT |
| Date Updated | 04/02/2025 |
| Payment Received | $0 |
| Last Payment Made | 02/27/2025 |
| Pay Status | >Account 120 Days Past Due Date< |
| Terms | Paid Monthly |
| High Balance (Hist.) | High balance of $3,600 from 11/2024 to 01/2025; $3,600 from 03/2025 to 04/2025 |
| Estimated month and year this item will be removed | 11/2031 |

# EXHIBIT D

https://www.thesheridanpress.com/news/local/another-scam-recorded-from-business-related-to-30-n-gould-st-registered-agent/article_52b040ca-f622-11eb-a595-e7f2de685e62.html

FEATURED

# Another scam recorded from business related to 30 N. Gould St. registered agent

By Ashleigh Snoozy | ashleigh.snoozy@thesheridanpress.com
Aug 6, 2021



Matthew Gaston | The Sheridan Press

**EDITOR'S NOTE**

The Sheridan Press' most recent article published in November 2024 outlines the attorney general's office in Wyoming is working on the issue, but it remains completely legal for registered agents to do what they're doing under Wyoming Statute.

The Sheridan Press receives dozens of correspondence regarding the issue weekly.

The Wyoming Attorney General's Office Consumer Protection Division has asked to be notified of any potential scam coming from registered agents or registered commercial agents out of Sheridan County or Wyoming at 307-777-8962 or 307-777-6397. **PLEASE CONTACT THEM DIRECTLY ABOUT THE ISSUE.**

The Sheridan Press staff also encourages those victimized by scams to report the potential scam to the Better Business Bureau.

f          ✗          ⊚          ✉          ⊕          🖶          ⎙

**EDITOR'S NOTE: The Sheridan Press' most recent article published in November 2024 outlines the attorney general's office in Wyoming is working on the issue, but it remains completely legal for registered agents to do what they're doing under Wyoming Statute.**

**The Sheridan Press receives dozens of correspondence regarding the issue weekly.**

**The Wyoming Attorney General's Office Consumer Protection Division has asked to be notified of any potential scam coming from registered agents or registered commercial agents out of Sheridan County or Wyoming at ag.consumer@wyo.gov. PLEASE CONTACT THEM DIRECTLY ABOUT THE ISSUE, not The Sheridan Press staff.**

**The Sheridan Press staff also encourages those victimized by scams to report the potential scam to the Better Business Bureau.**

SHERIDAN — Another scam emerged this week associated with a commercial registered agent at the 30 N. Gould St. address in Sheridan.

The Better Business Bureau received 31 complaints and seven negative customer reviews regarding Galaxy Line, LLC — developers of at least three diet and exercise-focused mobile applications.

The apps, Workout & Fitness Coach, Diet & Weight Loss Tracker and Step Counter and GPS Walks, are available for download on Apple's App Store and Google Play, according to a press release from BBB.

Complainants allege a number of concerns related to this company. The majority of customers report downloading a free trial version of a Galaxy Line app and then later being charged $86.99, without notice or consent, for a membership subscription to the app.

Customers further report being unable to cancel their membership, even when attempting to do so prior to the trial period expiring.

Of the 31 complaints submitted, 11 are currently pending. A Galaxy Line representative provided responses to two complaints; however, 18 others have been closed without the business' response.

"Galaxy Line advertises an address in Sheridan, however, this appears to be a commercial registered agent's location and is not typically a physical place of business," the BBB press release said. "BBB has been unable to locate a different address or a phone number for the business.

"BBB has attempted to contact Galaxy Line via email and postal mail in regards to the pattern of complaints and to seek information regarding their business practices, structure, ownership and location. The business has not responded to our concerns at this time."

Because of an article published Nov. 25, 2020, by The Sheridan Press, Sheridan County Chamber of Commerce's Dixie Johnson said state officials are aware of the issue and are working with complaints similar to that of the Galaxy Line business in the Wyoming Attorney General's office.

"We try to keep track when people call us," Johnson said, who said in November calls had increased, but said she hasn't seen a large increase since then.

Johnson said she and her staff at the Chamber will direct those with complaints to the Better Business Bureau, sharing contact information with them, in addition to contacting Kit Wendtland at the AG's office in Cheyenne.

The BBB consumer complaint office maintains it reports complaints and provides a rating and information based on those complaints to consumers. Galaxy Line currently has an "F" rating based on complaint volume, their failure to respond to the majority of complaints and their failure to be transparent about their location, products, services and business ownership, according to the press release.

"We're trying to drive people to do business with trustworthy businesses," BBB Northern Colorado and Wyoming President and CEO Shelley Polansky said. "Part of that is exposing businesses that are getting consumer complaint activity. We investigate the companies that are generating the consumer complaints."

From the Galaxy Line complaints and one other Polansky's staff found, she said the address at 30 N. Gould St. not only has several businesses under commercial registered agents, but there are also several commercial registered agents attached to that address.

Commercial registered agents are registered agents who represent more than 10 businesses in Wyoming. In basic terms, a registered agent represents a business formed in Wyoming, must have a physical address in the state, must be at their office address during normal business hours and can be served legal documents in the event a business the agent represents gets sued, according to previous reporting from The Sheridan Press.

According to the Wyoming Secretary of State website, there are approximately 450 commercial registered agents in Wyoming, the largest of which has offices in Sheridan.

Registered Agents, Inc., located at 30 N. Gould St. in downtown Sheridan, represents an estimated 53,267 businesses, according to the Secretary of State Office.

Registered Agents, Inc., though, is just one commercial registered agent listed at that address. According to a roster on the Secretary of State website, a total of 21 commercial registered agents have offices at 30 N. Gould St.

While representatives from the Wyoming Attorney General's Office and Wyoming Secretary of State's Office were not immediately available for comment, the Secretary of State's office is currently determining if its office received complaints regarding businesses and commercial registered agents related to the 30 N. Gould St. address.

Ashleigh Snoozy joined The Sheridan Press in October 2016 as a reporter before moving into the managing editor position in November 2018. She is a native of Colorado and graduated from Biola University in Los Angeles.

Ashleigh Snoozy
Managing editor